Our second case for this morning is Markle Insurance Company v. Lillian Rau as the representative of the estate of Chester Stofco. Mr. Holub. Thank you, Your Honor. May it please the Court. My name is David Holub. I represent the appellant, the estate of Chester Stofco. We're appealing the District Court's ruling on cross motions for summary judgment. The District Court erred in holding that Markle, the insurance company, is not obliged to indemnify its insured United Ambulance Service where one of United's ambulances killed Mr. Stofco. An insurance company, as principal over its agent, is answerable for its agent's failures to forward an insured's email coverage request. And in the case of motor vehicle insurance, there's a very high quasi-public nature to insurance that makes the fact that there was no coverage on this vehicle, as argued by Markle, something that I think the Court missed in its analysis. So let me ask you this, though. Giving you the benefit of the doubt, and I'm not sure how far we can go with this, but for right now, giving you the benefit of the doubt that this email made it to the intermediary, made it to this insurance service center, and even let's assume that that's enough somehow as a matter of law or maybe as a matter of fact to get it to Markle, under this policy, as I understand it, Markle has to issue an endorsement to make any changes. And if you had sent over, you're sort of assuming that it was a rubber stamp, that they were going to endorse any vehicle that you sent, whether it was a golf cart or whether it was an appropriate van for emergency services or whatever. But I'm having trouble with the fact that Markle does not ever issue an endorsement on this. Your Honor, I think that's an issue that the Court didn't address correctly at the district court level. So what we have is a pattern of no endorsements and still coverage in past practices between the two entities. So let's assume for a second that the, as you do, that the actual email was received, but there was no action. About a nine-month period elapsed, and the law in the two cases we cite, the Oz case and the Will case, both cover agency law, and they never get to any issue about whether an endorsement is issued. And I think those cases in particular, language was very similar to what they have in the Markle case, saying we have the right to issue an endorsement, and none was issued. The Court's never even addressed it because the key issue has to be analyzed through the agency relationship. If we – But can you tell me what's – the policy did say that there has to be an endorsement, right? And you're saying that that language was just overlooked by the parties? I'm saying that that language was never utilized or enforced by the policy consistently. Yeah, so overlooked. Consistently. Based on what? We've got – one of the things that I'd like to ask you to address specifically about this in connection with this issue, Mr. Holland, is what seems to be a dispute between counsel about what the record reflects with Mr. Pevick's testimony. Pevick was the fellow at the ambulance company, right, who dealt with the insurance service center. And did he testify that he had ever made a change where he had not gotten a response? He didn't testify to that, but in reality, a change was made and he didn't get a response. What was that? The change that was made that he got no response to was the email prior to this one that took the vehicle off of coverage and substituted another vehicle. There was never any endorsement. When did that happen? That was the 28th of February, I believe. That was like a month or so just before the issue, the email. That was the new policy? Just before the new policy issued? No, it was after the new policy was applied for. But I thought in that instance, once the new policy came around, you could see what the insurance company had agreed to. I mean, it's the same as an endorsement. It just happened to be on the anniversary. Well, Your Honor, the other issue that is confusing with that is in addition to issuing policies, there was also insurance cards issued. And insurance cards that were issued showed this particular ambulance that killed my client was a covered vehicle. Did they issue cards for the same number of vehicles as were listed on the policy, or did they issue an extra card? I believe, Your Honor, that it may be that an extra card was issued because I can't recall, and I wish I, you know, I don't want to be anything but honest. I can't recall if there was, but I think there might have been. Is there any evidence that the ambulance company relied upon the issuance of that card for vehicle 4497, treated as if it had been insured? They assumed that it was, according to the testimony. Of Tavik? It was never. They were shocked that there was a claim that this vehicle was not covered. So if we argue, if we consider that the Oz case and the Will case never, ever get to any point of looking at the issue of whether there's an endorsement, they simply get to the point of there's coverage because of a failure to act and a failure to respond to an application or to the notice or request. Now, in this case, there was a past history constantly of dealing with email. But there was some negative part of that history. I mean, I'm not getting into that because it seems like these may be disputed issues of fact, but sometimes the server wasn't working, so they thought an email was being sent, and it didn't even, like, get off the ground, so there wasn't even a bounce message. And then there's this. I feel like this should have been the subject of expert testimony, by the way, but some discussion about how the internal workings of Google's email service for companies operates. And, I mean, it's intuitively like the little cloud picture and stuff. So there's a lot that's fuzzy about these emails. Well, Your Honor, I would respectfully suggest that the way the email system works in this particular instance is entirely different from times when Mr. Pavick testified he had trouble with email. As we all know, if we're offline, let's say with our phones, and we have it in airport mode, we can send, thinking we're sending an email, but unless we're connected to the Internet or connected, there's never any transmission. But in this particular case, and that's what had happened to him in the past, but in this particular case, the evidence is very clear. He sent the email. A co-recipient got it. No way on earth that that email didn't go outside of the system of sending it and then come back. Well, you're saying that as a known fact, and for all I know, you may be right, but you may also not be right. The co-recipient was the CC inside the company. And I'm not a computer expert, is probably why I'm sitting here, but it's possible that internal distribution happens differently. It's possible, as you assert, that once it's gone out to anybody, it's gone out to everybody. Again, I feel like there are facts there that need nailing down. Your Honor, if that's a fact issue that you appreciate, it's not a fact issue that we see for the following reasons. Because we briefed and provided a request to take judicial notice, which very well sets forth absolutely settled information as to how email works. The UETA deals with that specifically, how email works. And it draws the line based on when it's out of the sender's control, when it's within the recipient's control, right? Yes, and that's what happened here with the fact that there was a CC that was received. By Mr. Blankenship. By Mr. Blankenship, and that there was no error message coming back saying not received. If anyone wanted to experiment, they could try to email to some bogus address. They'd get a bounce back that it's not received because it's not a real situation. Why does the dispute about the email even matter here? Because there was no endorsement, that's clear, and the policy requires an endorsement to change policy terms. And this is unequivocally a change in policy terms. And there was no representation made that this substitution of ambulances was acknowledged and that coverage was bound. And that's what distinguishes this case from the Ost case and the Willey case, where there were representations that the agent, the intermediary, had the authority to bind coverage. There were no such representations here. Respectfully, there's not. Those were promissory estoppel cases, is my point, and there isn't a factual basis for promissory estoppel here because there were no representations made. We don't read those two cases in that manner. We believe that both of those cases stand for the proposition that when you have an agent of this type, which is a soliciting agent, you've essentially, as an insurance company, set up a fortress between you and the insured. The insured can never reach the insurance company itself. Everything in this particular situation was set up that they could use e-mail, and Markell expected that e-mail be used. The mere fact that that e-mail was sent and received under the law is cited in both the Austin and Will cases. Governing agency law suggests that you have an obligation as an insured that you are then obliged to, you're stopped from having any ability to disclaim that coverage, or equity would allow you to do it. Now, in other cases, you have situations where, as we pointed out, for public policy purposes, because this is a quasi-public interest event, motor carriers with bigger ambulances would have an MSC 90 endorsement, which would totally obviate any need for VIN number verification. This was a one-for-one ambulance transfer. They've done it multiple times where an ambulance would be taken off for repair, they'd put another one on, Markell had every bit of information necessary to cover that vehicle. And in liability situations, I don't think there's any actual need for an underwriter to ever consider anything, unless it's now putting on a Ferrari that's going to go 150 miles per hour and maybe create a different risk liability-wise. But for property damage, sure, you might want to know what the VIN is, and it might become a very important issue, but not in this particular case. And when you have a business over and over adding vehicles, taking them off, just as a matter of routine, that suggests there's no need for anything further. And the e-mail that was just raised by Judge Hamilton that happened about a month before indicated that they were going to be putting a vehicle back on as soon as the repairs were done. Okay, if you want to save a little time for rebuttal, do you have a question? If I could, I do. And it's for both sides, but it really has to do with our jurisdiction at this point, which depends upon, as I understand it, a Rule 54B certification. Yes. Mr. Holub, from your point of view, if we were to affirm the decision in favor of Markell at this point, do you see any possibility that Markell would be returned to this larger dispute in some way in the future, or are they off the hook for good? I don't know whether some other entity would make a claim against them. They haven't yet? At this point, it's not in the pleadings. Okay. All right. Thank you. With no other questions, I believe I have about a minute. I'll give you a full minute. That's fine. Thank you. Mr. Easton. Good morning. May it please the Court. This case centers not on agency law, but on the basic elements of contract law. It's undisputed that when this policy was written, the ambulance in question didn't qualify as a covered auto. Could I ask you to address my question about whether there's any prospect that Markell, is Markell off scot-free if we affirm, or do you still face potential involvement in this? Markell would be off scot-free, to use Your Honor's terms. There is no pleading or cause of action currently pled at the district court level, other than that this automobile qualifies as a covered auto. So there would be no other available avenue to get at Markell, other than through the coverage question that we're . . . ISC and the ambulance company haven't asserted any claims? They have not. Okay. Thank you. So that's what remains, the plaintiff's claims against ISC. That is correct. Which are, yeah, okay, so not us. Thank you. Thank you. The basic contract elements, as we all know, offer acceptance consideration. Here, clearly there was no acceptance of any offer from the insurer to amend the policy. Now, it's your position, I take it, that even if we had ironclad evidence that the service center got the request to substitute out 4497 for the other ambulance, and, you know, they threw it in the wastebasket or they deleted it accidentally or they, you know, somehow never reached Markell, that in that instance Markell has no responsibility, even though the service center was acting as its agent, and that Markell, even if it did know that the agent was passing along this request for the substitution, that if Markell didn't look at it and say, that's okay with us and send the endorsement back, Markell's also off the hook. That's correct. Even assuming that the March 30 email had been received, there would still . . . All the way through the line, there would still be no coverage because there simply was no response of any kind from anyone. Center didn't respond, Markell didn't respond, nobody. So there was no acceptance of any kind, and we heard a lot about past practices as perhaps a justification for thinking they had coverage, even though there was no response. I think that is entirely inaccurate. So wasn't there the . . . I thought I remembered this instance where things were coming right up against the renewal deadline and there was a request to change, and I guess it's reflected on the renewed policy? Correct. On February 27, 2015, which is six days prior to the policy issuing, there was the request to remove the automobile that we're talking about . . . 4497. . . . 4497 from coverage under the policy that would be issued six days later. And put that old . . . put the old . . . what's it like a 1994 vehicle or something? Yeah, correct. They switched in one of their other ambulances. The policy issued six days later, two of those days were Saturday and a Sunday, as instructed. Now, appellants are arguing that the failure to send some other sort of response is evidence of a past practice, that they didn't always get a response. I completely disagree with that. The response was the issuance of the policy. Now, it wouldn't have been Markell, as I understand it, but correct me if I'm wrong, that would have issued those little insurance cards. Isn't that something that was done by the service center? That's absolutely correct. The service center, there was testimony that although there were only five automobiles as covered autos under the policy, there was a mistake made and seven cards were issued instead of five. One of those cards being the ambulance that we are discussing here today. Clear testimony it was an error. Markell was never made aware that those cards were issued. Most importantly, we know that the insurer didn't rely on those cards in any way, shape, or form. He testified very clearly. He didn't remember if he looked at them or whether he didn't, but we know that three weeks later he sent a request to put the subject automobile back, or allegedly sent a request to put the subject automobile back on the policy. If he thought he had coverage because he had looked at these inerrant ID cards, why would you send the March 30 email or allegedly send the March 30 email? So this case is really very basic contract elements case. We clearly do not have any acceptance. We clearly don't have any past practices. We have very clear testimony from the insurer that in all prior instances he would receive a response, whether that be an endorsement or otherwise. So you're thinking, I mean, that this is really on Mr. Pavick. He should have picked up the phone and called somebody at the service center and said, why don't I have the right list of vehicles? The reality is that Mr. Pavick and his testimony goes to this. He was, unfortunately, suffering through an illness at the time, but his testimony was basically he sent it. Again, that's in great dispute, and then just kind of went on about his other business, never did any follow-up, and like I say, never received any response of any kind from anyone. So there was no meeting in the minds. There was no valid contract to amend. Past practices don't get you to a point where you can overlook the basic contract elements. Mr. Easton, let me step back from this particular policy for a moment. And tell me whether I'm understanding this correctly. This tragic accident that apparently, as you view it, was with an uninsured vehicle, is a result of a kind of insurance policy that, in essence, falls between the gaps. What I mean by that is if you or I buy a personal automobile liability policy, we're covered ordinarily for any vehicle we drive, right? A personal automobile policy, I generally would agree with that. And businesses that run fleets of vehicles ordinarily just insure the fleet, right? That's correct, and there are specific fleet policies available which would do just that. And that is what would be needed, for example, if this company were operating larger vehicles and they had to be insured, right, under the federal regulations that you all have debated about? I don't know where the cutoff is as respects to the number of vehicles that a company may or may not be insuring. At least 10,000 pounds or more of commercial vehicles. There is most certainly weight restrictions as to whether or not a vehicle is considered a commercial motor vehicle under the federal regulations. And so, in essence, the tragedy here is with a vehicle operated by a company that has a very, very different kind of policy, only vehicle by vehicle, right? It is a specified automobile policy, which means that each and every vehicle that is covered under the policy must be specifically listed therein. And again, there are five. And that's acceptable to the Indiana Department of Insurance? It is. It is. It absolutely is. There is, again, there are fleet policies available which would cover an entire fleet. This is most certainly not one of those policies. Thank you. The cases that have been relied on here by appellant State Farm v. Oz and Willie v. Farmers, in each of those cases, the courts initially look to the basic contract elements before ever turning to any discussion of agency law. And in both of those cases, and in contrast to what we see here, the agent in question spoke to the insured, or at least there was testimony which was believed by the finder of fact that he was told, the insureds were told, you're covered, essentially. Here, again, we have absolutely no response. So without that basic contract formation, you don't ever get to the agency discussion that the two Illinois cases, Oz and Willie, discuss. So those cases are really very distinguishable from the situation that we have here. We also have very clear and unambiguous policy language in the Markell policy which states, and I'll just quote, this policy's terms can be amended or waived only by endorsement issued by us and made a part of the policy. Not only was there no endorsement issued here, there was utter silence. There was no response to the March 30 email at all. Finally, we've heard, and the briefing has a great deal of discussion about various estoppel arguments. First and foremost, however, estoppel under Indian law cannot be utilized to create coverage where it does not exist, and that's exactly what appellant is attempting to do here. This is clearly not a covered auto under the policy. Estoppel can't be utilized to create that coverage. We've also talked about the past practices as not warranting a basis to utilize the estoppel doctrine. Again, the insured testified that in all prior instances he'd received responses. He testified that he knew something more was required other than simply his email, and we've got our unambiguous policy provision, which states that an endorsement is required to modify the policy. As for the general safety arguments, the weight limitations in the federal regulations are not mere technicalities. They are the basis for determining whether or not a vehicle does or does not qualify as a commercial automobile, which then has the commensurate rules and regulations applied to it. So ultimately, this matter boils down to one of simple contract formation. Even assuming that March 30 email was received, it's undisputed there was no response, no acceptance of any kind, and for that reason, I would ask that this court affirm the district court's ruling in favor of Markell. Is it a criminal violation in Indiana for a business like this ambulance company to operate an ambulance that's uninsured? That's absolutely correct. There are regulations, laws, statutes, which require that any vehicle that's operating, whether it be commercial or otherwise, must have insurance. And we saw in the briefing a hypothetical about, well, what if you made a request and then there was an accident an hour later? Well, the answer is you shouldn't have been on the road because that is a direct violation of Indiana law. All right. Well, I see no further questions, so thank you very much. All right. Thank you. Mr. Holub, I said I'd give you a minute. Thank you. I think the issue is, it should be analyzed this way, that Markell's inaction on acting on that request prevents it from disclaiming coverage, and there's nothing in the UTE. What case do you have that would support that? Because another way of looking at it is to say that although Markell uses an agent for purposes of communication, it's reserved to itself the right either to issue or not to issue endorsements, and the agent's scope of authority simply doesn't go that far. Both the Aus case and the Will case support that, but more particularly the Will case cites California cases, and those are citing saying there's an estoppel from asserting a non-coverage in an instance like this. Any indication from Indiana law? There's nothing that we see, Indiana, that deals with that particular issue. But the citation quotes directly from Appelman, the rule that an insurer must act promptly to find its source is in the quasi-public nature of the insurance business and the reasonable expectation of the applicant and the general public. The general public in this instance is Mr. Stofko and his family, and there's no dispute the email was sent and that it was received by the server of the center. Okay, I think we have your point. So thank you very much. Thanks to both counsel. We'll take the case under advisement.